258 Kan. 254 (1995)
IN THE INTEREST OF M.M.L., A Child in Need of Care.
No. 73,049
Supreme Court of Kansas.
Opinion filed July 21, 1995.
Gail Carpenter, of Carpenter Law Offices, of Great Bend, argued the cause and was on the brief for appellant.
Joel B. Jackson, guardian ad litem, of Great Bend, argued the cause and was on the brief for appellee M.M.L.
*255 Rick J. Scheufler, assistant county attorney, argued the cause and was on the brief for appellee State of Kansas.
The opinion of the court was delivered by
HOLMES, C.J.:
The natural father of M.M.L., a minor, appeals in a child in need of care case from an order of the district court placing M.M.L. in long-term foster care. He argues the best interests of the child standard in K.S.A. 38-1563(d) violates his constitutional right to custody of his child absent a finding of unfitness. The case was transferred to the Supreme Court pursuant to K.S.A. 20-3017.
In compliance with the intent of Supreme Court Rule 7.043 (1994 Kan. Ct. R. Annot. 42), the natural father will be referred to as appellant or Michael and the natural mother will be referred to as J.C.
This case, originally filed pursuant to the Kansas Code for Care of Children, K.S.A. 38-1501 et seq. alleging M.M.L. was a child in need of care, has had a long and tortured history. Despite extensive efforts by Michael, the courts, counsel, various social and professional workers, and others involved in this case, the results have been far from satisfactory. It appears that much of the original difficulty encountered in attempting to reach a solution to the conflicting claims and positions of the parties arises from the long-term animosity which has existed between Michael and J.C. Apparently, J.C. has taken every opportunity to criticize and demean Michael to M.M.L. and has gone to great lengths to poison M.M.L. against her father. On the other hand, M.M.L. complains that her father constantly criticizes and says bad things about her mother. Even though J.C. has moved to Texas and has apparently abandoned any interest in these custody proceedings or in her daughter, M.M.L. maintains a strong bond and feeling for her mother.
Due to the nature of the action the facts, as determined from a greatly abbreviated record, will be set forth in some detail.
Michael and J.C. were married in 1974, and one son, now an adult, was born to the marriage. The couple was divorced in 1979; however, they reestablished a relationship and lived together until sometime in 1984, apparently as residents of the Kansas City, Missouri, *256 area. M.M.L. was born during this period on January 4, 1981. In mid-1984 M.M.L. and her mother left the home, and at some later date J.C. married M.C., whose name is also Michael. The coincidence of both the father and stepfather having the same first name, Michael, creates some confusion in attempting to get a clear picture of some of the events described in the record. In an attempt to avoid further confusion, we will refer to the father of M.M.L. as Michael and the stepfather as M.C.
In 1985 Michael filed a proceeding in Missouri to obtain custody of both children. Soon thereafter M.M.L. alleged she had been sexually abused by "Michael" or by one of her mother's boyfriends. As it eventually turned out, Michael, the father, was absolved of any sexual abuse of M.M.L., although expert testimony did establish that she had, in all probability, been abused by someone, either M.C. or one of the other friends of J.C.
Sometime in 1985 Michael moved to the state of Washington and lost track of his children. His custody suit was dismissed when he failed to show up for the hearing. Thereafter M.M.L. and her mother moved to Great Bend. Despite his efforts to obtain information about M.M.L from her maternal grandmother, Michael was unable to obtain any information about her whereabouts or about her welfare. Michael moved back to Kansas City in 1988 or 1989, to Georgia in 1989, and back to Kansas City in late 1991 or 1992. In late 1990 or early 1991 Michael learned by chance that J.C. and M.M.L. were in Great Bend. He has been attempting to gain custody ever since.
On September 6, 1990, M.M.L. was placed in the temporary custody of the Department of Social and Rehabilitation Services (SRS) based on allegations that she had been sexually abused by M.C. She was placed by SRS in a foster home in Great Bend, where she has remained since. On January 17, 1991, the trial court found by clear and convincing evidence that M.M.L. had been sexually abused by her stepfather and adjudicated her a child in need of care. At that point Michael had not had contact or a relationship with M.M.L. for approximately five years. At a dispositional hearing held March 12, 1991, the court found that placing M.M.L. with her father was not a viable option at that time and denied him *257 visitation rights so that M.M.L.'s therapist could prepare her for future visitation. It was at about this time that J.C. moved to Texas and apparently abandoned any interest in M.M.L. or in any further court proceedings in her behalf.
As the case progressed, review hearings were held and, in early 1992 Michael was granted visitation rights. Initially the visits were limited to supervised visits in Great Bend, but eventually Michael was granted unsupervised visits at his home in Kansas City for several days at a time. Throughout the proceedings, Michael did everything requested of him by the court. Various examinations indicated (1) he does not portray sexual offender characteristics; (2) he has never sexually abused M.M.L.; (3) he exhibits no psychological problems impairing his ability to care for his daughter; and (4) he shows no signs of alcoholism or drug abuse. He has attended alcohol information school, effective parenting classes, anger-control counseling, counseling for parents of sexually abused children, individual counseling, and joint counseling with M.M.L. Home studies have been performed and the latest done in July 1994 recommended M.M.L. be placed in Michael's home with supervision.
Despite Michael's efforts, M.M.L. maintained throughout the proceedings that she did not want to live with him. Although she was initially excited and hopeful about a relationship with her father, she became frightened and disillusioned as the visits progressed. From the outset of the case, M.M.L. saw a psychologist, Dr. Kohrs. M.M.L. repeatedly expressed two concerns about her father's behavior to Dr. Kohrs, which Dr. Kohrs believed were based on M.M.L.'s observations and not on any "predictions" given to M.M.L. as a child by her mother. First, M.M.L. described "a pattern of arbitrary and provocative hostility" by her father, such as verbally abusing and continually provoking arguments with his mother to whom M.M.L. is attached, making exaggerated and hostile complaints in public places, teasing her cousins unnecessarily, and having conflicts with her aunts and foster mother. Michael's mother and his sisters (the aunts) deny these allegations. M.M.L. does not trust him and is afraid he will sexually abuse her because he gets so "`pushy and mad.'"
*258 Second, M.M.L. was concerned with her father's use of alcohol. Although he acknowledges occasional use of alcohol, he denies any problem, and various psychological tests and counseling bear that out. M.M.L.'s emotional and psychological concerns about sexual abuse and excessive use of alcohol appear to be a result of her early childhood experiences with her stepfather and one or more of her mother's other male companions.
M.M.L. seems to have established a good relationship with her paternal grandmother and her aunts, all of whom reside near Michael in the Kansas City area. The grandmother lives next door to Michael, and she and Michael's sisters are supportive of his efforts to obtain custody of M.M.L. They are also available to assist Michael in caring for M.M.L.
Dr. Kohrs believed M.M.L. tried to focus on the positive aspects of the relationship, and M.M.L. likes it when Michael is nice to her and takes her bowling. She feels good about herself when she cooks meals for him and has appreciated getting to know her relatives in the Kansas City area. However, based on M.M.L.'s concerns, Dr. Kohrs recommended that M.M.L. remain in the foster home in Great Bend and continue visitation with her father and relatives in Kansas City. She was concerned "that if the situation is this problematic while being monitored by SRS and the Court, what the quality of home life would be if there were no scrutiny by the Court."
In contrast, M.M.L. was firmly attached to the foster care home, describing it as a place where she was safe, secure, and part of a family. At an earlier hearing, a counselor testified M.M.L. would suffer grief, loss, and confusion about her identity if she had to move away from the foster home and that moving her would add to the confusion and chaos in her life. Also, at this hearing, Dr. Kohrs testified the optimum placement was in the foster home because the children were involved in school and community activities and the relationship was not filled with conflict like the one with Michael.
On the other hand, professionals in the Kansas City area who have counseled with Michael over the years of these proceedings and with both Michael and M.M.L. on the occasions when she *259 visits in Kansas City reach a diametrically opposite conclusion. They recommend that M.M.L. be placed in her father's custody. From their reports and the testimony of Michael, M.M.L. seems to be happy and well adjusted when with her father. She voiced no serious complaints to the Kansas City counselors and professionals. However, upon returning to Great Bend she apparently tells a totally different story and has consistently maintained she will not live with her father. The record includes several letters written by M.M.L. to the court in which she voices her desire to stay with her foster parents and complains bitterly about her father's actions and appearance.
On June 8, 1993, Michael moved for an order placing M.M.L. in his custody. He alleged that despite his compliance with all court orders, SRS had refused to prepare a reintegration plan with measurable objectives and time schedules and the only reason articulated for not placing M.M.L. with him was her desire not to live with him. On June 14, 1993, the magistrate denied the motion and recommended long-term foster care placement, finding it was not in M.M.L.'s best interests to return her to the custody of her parents.
Upon Michael's request for review of the magistrate's ruling, the district court found in October 1993 that SRS should make an additional effort to reintegrate M.M.L. and later approved a reintegration plan. At a dispositional hearing on August 15, 1994, the district court concluded K.S.A. 38-1563 took precedence over In re Guardianship of Williams, 254 Kan. 814, 869 P.2d 661 (1994), and the best interests of the child test was the appropriate standard for the court to apply. The court found that although Michael was not an unfit parent, no close bond existed between Michael and M.M.L. despite his tremendous efforts. While reasonable efforts had been made to reintegrate M.M.L., the efforts had not been successful largely due to M.M.L.'s attitude and fears. The court believed forcing M.M.L. to live with her father could cause more emotional damage. Because a close bond existed between M.M.L. and her foster family, the court continued placement in long-term foster care with visitation to be worked out by the parties.
*260 At the August 15, 1994, hearing the court recognized the conflicting testimony of the various therapists, counselors, psychologists, and other professionals, stating, "[W]hat we do have are recommendations from several professional people.... [T]hese recommendations ... are in direct contrast to each other." In the journal entry the court made the following findings:
"1. That the natural father is not an unfit parent.
"2. That the Court recognizes that a parent has a fundamental right to have custody of his or her child.
"3. That the Kansas Code for the Care of Children and the statutory language of K.S.A. 38-1563 supersedes or takes precedence over that fundamental right and case law, specifically In re: Guardianship of Williams, 254 Kan. 814 (1994).
"4. That pursuant to the Code for the Care of Children, upon a finding under K.S.A. 38-1563(h), that reasonable efforts have been made to prevent or eliminate the removal of the child ... from the parent's home, the Court can make a determination of disposition pursuant to K.S.A. 38-1563(d) based upon what is in the best interests of the child.
"5. That the Court finds that reasonable efforts have been made to reintegrate the child into the home of the natural father.
"6. That said efforts have not been successful due mainly to the attitude of the minor child.
"7. That a close daughter-father bond does not exist despite the efforts of the father to re-establish that bond.
"8. That placement of the child with the natural father could cause more emotional damage to the minor child.
"9. That a close bond between the foster family and the child exists.
"10. That placement therefore should continue in long term foster care with continuing visitation as agreed to by the parties between the father and the minor child."
There have been literally dozens of hearings held by the court and hundreds of hours devoted to this case by dedicated judges, counsel, and professional workers in an attempt to arrive at an acceptable solution to the apparent legal and emotional conflict between Michael and M.M.L. and/or SRS. While the legal principles, applicable statutes, and constitutional arguments are not extremely difficult to resolve, it is doubtful any good solution to the dilemma facing the trial court and this court exists.
Michael asserts two issues on appeal:

*261 "I. Whether or not K.S.A. 38-1563 is unconstitutional and violates the parental fitness doctrine announced by the Kansas Supreme Court in In re [Guardianship of] Williams, 254 Kan. 814, 869 P.2d 661 (1994).
"II. Whether or not the district court abused [its] discretion in awarding long term foster care with SRS over the objection of the natural father."
For his first issue on appeal Michael argues K.S.A. 38-1563(d), either on its face or as applied, violates his "fundamental right protected by the 14th Amendment." He argues that, under the parental preference doctrine reaffirmed in In re Guardianship of Williams, 254 Kan. 814, he has a constitutional right to custody of his child which may not be disturbed absent a finding of unfitness. The State and guardian ad litem argue Williams is not applicable to this case because the Kansas Code for Care of Children (Code), K.S.A. 38-1501 et seq., provides the same if not better protection than that afforded by the parental preference doctrine.
Although Michael argued to the trial court that Williams applied to his case, he did not specifically argue that K.S.A. 38-1563(d) is unconstitutional. Ordinarily, "where constitutional grounds for reversal are raised for the first time on appeal, they are not properly before the appellate court for review." In re D.D.P., Jr., 249 Kan. 529, 545, 819 P.2d 1212 (1991). We have recognized exceptions to the general rule when the interests of justice so require. In State v. Puckett, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982), we held:
"Although ordinarily an appellate court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal, the court does have the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the interests of justice or to prevent denial of fundamental rights."
Michael asserts the constitutional issue here is the denial of a fundamental right protected by the Fourteenth Amendment and that we should consider the constitutional issues because the district court's ruling placed the constitutionality of the statute at issue. In addition, all parties have thoroughly briefed the issue. See Puckett, 230 Kan. at 601. We will address the issue.
It is the application of K.S.A. 38-1563(d) to the facts of this case which constitutes the crux of the arguments now before the court. *262 K.S.A. 38-1563 provides authorized dispositions for a child found to be a child in need of care and reads, in pertinent part:
"(d) If the court finds that placing the child in the custody of a parent will not assure protection from physical, mental or emotional abuse or neglect or sexual abuse or will not be in the best interests of the child, the court shall enter an order awarding custody of the child, until the further order of the court, to one of the following:
(1) A relative of the child or a person with whom the child has close emotional ties;
(2) any other suitable person;
(3) a shelter facility; or
(4) the secretary." (Emphasis added.)
A brief review of the pertinent statutes is in order. K.S.A. 38-1563 is part of the Code. The Code, which is based on the State's parental power, is to be "liberally construed, to the end that each child within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the child's own home, as will best serve the child's welfare and the best interests of the state." K.S.A. 38-1501. If the court finds by clear and convincing evidence that a child is in need of care, the court shall enter an order adjudicating the child to be a child in need of care and an order of disposition authorized by the Code. K.S.A. 38-1555; K.S.A. 38-1556. K.S.A. 1994 Supp. 38-1502(a)(3) defines a child in need of care in pertinent part as one who "has been physically, mentally or emotionally abused or neglected or sexually abused."
Prior to entering an order of disposition, the court is required to consider "the child's physical, mental and emotional condition; the child's need for assistance; the manner in which the parent participated in the abuse, neglect or abandonment of the child; and the evidence received at the dispositional hearing." K.S.A. 38-1562(c). If a child is placed outside the home and reintegration into the family is the goal, a plan shall be prepared with measurable goals and objectives. K.S.A. 1994 Supp. 38-1565(a). Progress reports are to be submitted to the court at least every six months, and a hearing shall be held if the court determines the progress is inadequate or the goals are no longer viable. K.S.A. 1994 Supp. 38-1565(b).
*263 In the instant case all parties concede that Michael is not unfit to have the care and custody of M.M.L. It is also apparent that he has gone to great lengths to improve his parenting capabilities and educate himself in the skills necessary to raise his daughter. He has adequate physical and residential facilities for her care and also has the support of his sisters and mother, who are available to furnish family support. There has been no showing he could not furnish the "care, custody, guidance, control and discipline" contemplated by K.S.A. 38-1501.
Michael contends that K.S.A. 38-1563(d) is either unconstitutional on its face or unconstitutional as applied to the facts of this case because the best interests of the child test, contained in the statute, violates his right to due process under the Fourteenth Amendment to the United States Constitution. He asserts that the parental preference rule is the proper test and that failure to apply it denies his fundamental right to custody of M.M.L.
Michael relies heavily upon In re Guardianship of Williams, 254 Kan. 814, and Sheppard v. Sheppard, 230 Kan. 146, 630 P.2d 1121 (1981), cert. denied 455 U.S. 919 (1982).
In Sheppard, Catherine and Steven Sheppard were divorced in 1977, with Catherine being awarded legal custody of their son. Prior to and during their marriage, both Catherine and her son lived with Catherine's parents in Haysville, Kansas. Following the divorce, however, Catherine moved to Wichita while her son continued to live with her parents and attend the Haysville schools. In 1980, Catherine's parents petitioned the court, seeking legal custody of their grandson. Although the district court found that Catherine was not an unfit parent, the court placed her son in the permanent custody of her parents. At issue was the constitutionality of K.S.A. 1980 Supp. 60-1610(b)(2), which allowed such action and provided in part: "Notwithstanding the parental preference doctrine the court may award custody of any child to such person [a third party who has had custody] if the best interests of such child will be served thereby."
The court succinctly stated the issue as follows:
"Appellant contends that K.S.A. 1980 Supp. 60-1610(b)(2) violates the due process clause because it destroys the parental preference doctrine and allows a *264 third party to take custody of a minor child even though the natural parent is fit. That is the situation before us: The court found the mother fit, but granted custody of the child to the grandparents, finding that such custody would be in the best interests of the child." 230 Kan. at 149.
In reversing the district court's order, this court stated:
"The United States Supreme Court recently recognized the fundamental nature of the relationship between parent and child in two cases, both of which involve the rights of natural parents of illegitimate children: Stanley v. Illinois, 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972), and Quilloin v. Walcott, 434 U.S. 246, 255, 54 L.Ed.2d 511, 98 S.Ct. 549, reh. denied 435 U.S. 918 (1978). In the latter case the court said:
`We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'"
....
"It is clear under our decisions and those of the United States Supreme Court that a natural parent's right to the custody of his or her children is a fundamental right which may not be disturbed by the State or by third persons, absent a showing that the natural parent is unfit. As we noted in In re Cooper, 230 Kan. 57, 631 P.2d 632 (1981), a parent's right to the custody, care, and control of his or her child is a fundamental liberty right protected by the Fourteenth Amendment of the Constitution of the United States.
"The statute under consideration takes away that right. Fitness of a parent is no longer the criterion. If the trial court determines that the best interests of the child will be served by placing it with third persons, the court may do so. The parent need not consent, and he or she may be perfectly fit, willing, and able to care for and raise the child. No exceptional circumstances need exist.
"... [The natural mother] cannot be denied that right for the sole reason that a court determines and concludes that someone other than a natural parent might do a better job of raising the child, thus furthering his `best interests.'
....
"What we hold here is simply this: that a parent who is not found to be unfit, has a fundamental right, protected by the Due Process Clause of the United States Constitution, to the care, custody and control of his or her child, and that the right of such a parent to custody of the child cannot be taken away in favor of a third person, absent a finding of unfitness on the part of the parent. We hold that K.S.A. 1980 Supp. 60-1610(b)(2), which destroys that fundamental right, is violative of the Due Process Clause and therefore unconstitutional." 230 Kan. at 150-54. (Emphasis added.)
*265 In re Guardianship of Williams, 254 Kan. 814, involved an action by a natural mother to terminate a voluntary guardianship established for her minor child at a time when the mother was experiencing financial and emotional problems. The guardian, who had become attached to the child, opposed the termination, alleging it would be in the child's best interests for the guardianship to be continued. In Williams the court reviewed at length the parental preference doctrine as applied in Kansas and the fundamental constitutional rights of natural parents to custody of their children absent a finding of unfitness. The court stated:
"The best interests test was stated in Parish v. Parish, 220 Kan. 131, 132, 551 P.2d 792 (1976), as follows: `In determining the right of custody of children between parents, the primary consideration is the best interest and welfare of the children, and all other issues are subordinate thereto.' See Patton v. Patton, 215 Kan. 377, 524 P.2d 709 (1974); Dalton v. Dalton, 214 Kan. 805, 522 P.2d 378 (1974); Moran v. Moran, 196 Kan. 380, 411 P.2d 677 (1966). The Kansas courts have long applied the best interests of the child test in resolving custody disputes between two fit parents.
"On the other hand, it has long been the rule that the parental preference doctrine prevails when the dispute is between a parent and a third person, unless the parent is found to be unfit. The rule is succinctly stated in Christlieb v. Christlieb, 179 Kan. 408, 409, 295 P.2d 658 (1956), as follows:
`[A] parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to the custody of his children as against grandparents or others who have no permanent or legal right to their custody, even though at the time the natural parent seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them.'
"The Kansas Supreme Court has held that child custody is a fundamental right of a parent, protected by the due process clause of the Fourteenth Amendment. In Sheppard v. Sheppard, 230 Kan. 146, 630 P.2d 1121 (1981), cert. denied 455 U.S. 919 (1982), the court declared as unconstitutional a statutory provision which required the court to apply the best interests test instead of the parental preference doctrine in certain parent-nonparent custody disputes....
....
"At the root of the parental preference doctrine is the recognition in Kansas that public policy deems the doctrine as being in the best interests of the child. In In re Kailer, 123 Kan. 229, 255 Pac. 41 (1927), the natural father of eleven-day-old twins entrusted the care of the children to his brother and sister-in-law. The natural mother had died and the father was unable to properly care for the *266 newborn infants. Several years later he sought to regain custody of the children. This court stated:
`[T]he welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a judicial question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves.' 123 Kan. at 231.
....
"The best interests of the child test, which is asserted here by [the child's guardian], has long been the preferred standard to apply when the custody of minor children is at issue between the natural parents of the child or children. However, absent highly unusual or extraordinary circumstances it has no application in determining whether a parent, not found to be unfit, is entitled to custody as against a third-party nonparent. As stated in In re Eden, 216 Kan. 784, 786-87, 533 P.2d 1222 (1975):
`The cases where we have held the "best interests" test applicable were all cases where the dispute was between parents. [Citations omitted.] Where, as here, the dispute is between strangers and a natural parent who is not unfit and who is able and willing to care for the children, the parent's right must prevail. This is so even though the trial court might feel that it would decide otherwise if free to consider only the `best interests' of the children, apart from the benefits to be derived from the love and care of the natural parent.'" 254 Kan. at 819-27.
In concluding, the court held:
"We adhere to the rule that absent highly unusual or extraordinary circumstances the parental preference doctrine is to be applied in a custody dispute over minor children when the dispute is between a natural parent who has not been found unfit and a nonparent. Likewise, we adhere to the rule that the best interests of the child is the appropriate standard to be applied in custody disputes between parents." 254 Kan. at 828.
The State argues at length that Michael's fundamental constitutional rights must give way to the best interests of the child test set forth in the statute because actions under the Code are deemed to be taken and done under the parens patriae doctrine or parental power of the State. It also argues that because M.M.L. was found *267 to be a child in need of care by clear and convincing evidence, Michael's due process rights were adequately protected.
The State contends that the long line of Kansas cases recognizing the parental preference doctrine as being the public policy of Kansas are distinguishable because those cases primarily involved a dispute between a parent and a nonparent and were not based upon the State's interest under the parental power of the State. While we recognize that the State's parens patriae interest in protecting the welfare of children may take precedence over the rights of the parents, such power only becomes applicable when there is a clear showing that the welfare and safety of the child require such extreme action.
In In re Woodard, 231 Kan. 544, 646 P.2d 1105 (1982), the court was faced with determining the sufficiency of publication service in an action to sever parental rights. While the present case does not involve any attempt to sever Michael's parental rights, the court's discussion of the parens patriae doctrine in Woodard is informative. The court stated:
"The United States Supreme Court and our own state appellate courts have recognized repeatedly that parental rights are fundamental, substantive rights not to be meddled with absent a compelling countervailing protection interest. See Stanley v. Illinois, 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972); In re Cooper, 230 Kan. 57, 631 P.2d 632 (1981); Sheppard v. Sheppard, 230 Kan. 146, 630 P.2d 1121 (1981); In re Lathrop, 2 Kan. App.2d 90, 575 P.2d 894 (1978).
"On the other hand, the State's parens patriae interest in protecting the welfare of its children must take precedence over the rights of the parents when the welfare of the child requires such a determination. In Cooper, Justice Fromme summarized the balancing of the child's welfare against the parents' rights as follows:
`This court has long recognized the State's interest in protecting its children and assuring they receive proper care. State ex rel. O'Sullivan v. Heart Ministries, Inc., 227 Kan. [244, 253, 607 P.2d 1102 (1980)]; Murphy v. Murphy, 196 Kan. 118, 122, 410 P.2d 252 (1966). In the State's exercise of its parens patriae powers, the child's best interests are always the paramount consideration. In re Nelson, 216 Kan. 271, 276, 531 P.2d 48 (1975); In re Wheeler, 3 Kan. App.2d 701, 703, 601 P.2d 15, rev. denied 227 Kan. 927 (1979). The parents' rights cannot be disregarded, however, and the child's best interests may be considered in conjunction with the parents' rights. In re Armentrout, 207 Kan. 366, 370, 485 P.2d 183 (1971); Lennon v. State, 193 Kan. 685, 691, 396 P.2d 290 (1964). The parents' rights are subordinate to the State's parens patriae powers and must yield when *268 adverse to the best interests of the child. State v. Garber, 197 Kan. 567, 572, 419 P.2d 896 (1966); Lennon v. State, 193 Kan. at 691. It is presumed that the best interests of the child are served by the retention of the child's custody in the natural parents. In re Armentrout, 207 Kan. 366.' [230 Kan. 62-63.]" (Emphasis added.) 231 Kan. at 550-51.
A review of the numerous Kansas and United States Supreme Court cases involving the powers of the State under the parens patriae doctrine clearly indicates that the courts must assert a balancing test between the fundamental constitutional right of parents to the care, custody, and control of their children and the power of the State to ensure the protection and welfare of children. In balancing the interests of all parties, the best interests of the child is a factor to be considered and must be given appropriate weight. However, absent a showing that the parent is unfit or that there are highly unusual or extraordinary circumstances mandating the State's exercise of its parens patriae powers, the rights of the parent must prevail.
In considering the constitutionality of K.S.A. 38-1563(d), certain basic principles apply:
"`The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution.'
"`In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done.'
"`Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt.'
"`The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject are wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public interest as that is a legislative function with which courts cannot interfere.'" Sheppard v. Sheppard, 230 Kan. at 148-49 (quoting City of Baxter Springs v. Bryant, 226 Kan. 383, Syl. ¶¶ 1-4, 598 P.2d 1051 [1979]).
We recognize the need of the State, in the exercise of its parens patriae duties, to be able to assume the care, custody, and control of a child when the welfare of the child clearly requires such action. *269 In such circumstances, it may be said that the best interests of the child as set forth in K.S.A. 38-1563(d) is an appropriate test if certain safeguards are first met. The statute as written is overly broad and, without appropriate limitations, would be unconstitutional on its face. However, this court has long taken the position that a statute, otherwise unconstitutional, may be authoritatively construed as constitutional when appropriate safeguards or limitations are incorporated therein. See, e.g. State v. Robinson, 239 Kan. 269, Syl. ¶ 4, 718 P.2d 1313 (1986); State v. Thompson, 237 Kan. 562, 564, 701 P.2d 694 (1985).
We therefore construe the best interests of the child language contained in K.S.A. 38-1563(d) to be constitutional when applied in a child in need of care case in which the court has found by clear and convincing evidence that the parent or parents are unfit or that highly unusual or extraordinary circumstances exist which substantially endanger the child's welfare. Absent such findings the long-standing parental preference doctrine controls.
Here, the evidence reflects that M.M.L. undoubtedly suffered sexual abuse as a child at the hands of persons other than Michael. She does have severe emotional problems which require further counseling. However, the primary basis of the trial court's holding was that M.M.L. does not want to leave her friends and comfortable foster home surroundings in Great Bend, coupled with her professed dislike of her father. Such feelings are not unusual in children who have become attached to, and feel comfortable with, their peers, school, and other surroundings. Such feelings and wishes do not, in our opinion, constitute the highly unusual or extraordinary circumstances necessary to deprive a parent, who is not unfit and who is capable and desirous of providing the necessary care, control, and guidance of his or her child, of the custody of the child. We conclude that under the facts of this case, K.S.A. 38-1563(d), as applied, violated Michael's constitutional rights.
The State also argues that Michael's due process rights were adequately protected by the original child in need of care proceeding. Michael does not contend that in 1990 when these proceedings started that M.M.L. was not a child in need of care. He admittedly had been absent from any family environment involving *270 M.M.L. for nearly five years. However, his absence was not all of his own choosing. J.C. had moved from the home taking the children, and his efforts to locate them were thwarted by members of her family who would not furnish him any information. It was only by chance in talking with another over-the-road truck driver that he located M.M.L. and her mother in Great Bend.
M.M.L. was properly determined to be a child in need of care under K.S.A. 1994 Supp. 38-1502(a)(3) because of sexual abuse suffered at the hands of her stepfather, M.C., and perhaps other friends of J.C. However, Michael was not the perpetrator of such sexual abuse. The fact that Michael's procedural due process rights may have been constitutionally protected at the time of the original child in need of care determination does not thereafter bar his present attempts to gain custody of his child.
The primary objective of the Code is that each child "shall receive the care, custody, guidance, control and discipline, preferably in the child's own home, as will best serve the child's welfare and the best interests of the state." K.S.A. 38-1501. Michael's fundamental right to the custody of M.M.L. "may not be disturbed by the State or by third persons" absent a showing of unfitness. (Emphasis added.) Sheppard, 230 Kan. at 152. The welfare of M.M.L. and the best interests of the State mandate that Michael be given the opportunity to assume his parental duties and obligations. We recognize that M.M.L. will need continued counseling and Michael must make such provisions for further counseling with qualified personnel in the Kansas City area as may be directed by the trial court.
In conclusion, we hold that the best interests of the child test contained in K.S.A. 38-1563(d) is constitutional when the court has determined by clear and convincing evidence that the parent is unfit or that highly unusual or extraordinary circumstances exist which substantially endanger the child's welfare. Absent such evidence and findings, the statute is unconstitutional, and the rights of the parent or parents under the parental preference doctrine are paramount and control over the parental power of the State. We further order that the custody of M.M.L. be placed with her father, Michael, subject to appropriate continued counseling in the *271 father's residential area and under such conditions of reporting and monitoring as may be directed by the court.
In view of the result reached we need not consider Michael's second issue.
The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.