NOT DESIGNATED FOR PUBLICATION

Nos. 123,334
123,335
123,336

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of C.N. Jr., C.N., and A.N.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD KUCKELMAN, judge. Opinion filed October 22, 2021. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural father.

*Meredith D. Mazza*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before MALONE, P.J., POWELL and CLINE, JJ.

PER CURIAM:  C.N. Sr. (Father) appeals the district court's termination of his parental rights over his son, C.N. Jr., and his two daughters, C.N. and A.N. (collectively, the Children). Father argues (1) the district court violated his due process rights when it improperly applied the presumption of unfitness under K.S.A. 38-2271 and (2) the evidence was insufficient for the district court to find him unfit.

H.W. (Mother), the Children's biological mother, stipulated that the Children needed care. The district court terminated Mother's parental rights on November 12, 2019. She does not appeal.

1

Father's case in district court spanned from the time the child in need of care (CINC) petition was filed in August 2014, to the termination of parental rights order filed in February 2020. C.N. Jr. is now 18 years old, C.N. is 15 years old, and A.N. is 14 years old. The record on appeal includes 16 volumes covering over 4,000 pages of court files, transcripts, and exhibits. After carefully reviewing the record and Father's arguments on appeal, we find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 2014, the Kansas Department for Children and Families (DCF) received a report of alleged physical abuse of C.N. Jr. Leavenworth Police Department and DCF investigated. Investigators found the Children home alone. The social worker called Father at work, and he came home. DCF's investigation found that Father "whooped" the 11-year-old boy with a belt across his arms for walking home after school the day before. C.N. Jr. had red marks on his arms and a faint mark on his leg.

During the investigation the Children reported that sometimes Father makes them "pump water" as a form of punishment, anywhere from 15 minutes to 2 hours. "Pumping water" appeared to the social worker as a squatting exercise. Father disputed that he ever made the Children exercise rigorously for more than 20 minutes at a time, and he alleged that the Children did not accurately grasp time concepts. C.N. Jr. said he was not afraid to be at home, but he was afraid of spiders. His sister, C.N., reported feeling unsafe at home sometimes but could not articulate why she had the feeling. At the initial investigatory meeting, Father signed a safety plan agreeing to refrain from future corporal punishment.

The next day, DCF made a follow-up call to Father and interviewed all the Children at school. DCF learned that Mother has lupus, bone marrow problems, and depression. Father said that Mother was too ill to care for the Children and that she only saw them maybe three times a year. Father's girlfriend, D.F., (Girlfriend) tended to the

2

Children sometimes when Father was working. Girlfriend said that she and Father only physically hit the children when necessary, and "pumping water" and push-ups were the preferred methods of discipline.

On this day, C.N. Jr. said he only sometimes feels safe at home and sometimes safe at Girlfriend's house, contradicting his assertion the day before that he was not afraid to be home. C.N. Jr. recounted to the social worker a previous incident where Girlfriend "choked" and "slammed" him for allegedly stealing candy.

Girlfriend replied that the Children are on medication for attention deficit disorder (ADD), which may cause them to exaggerate. She also said that C.N. was known to lie. Girlfriend refused to allow DCF to visit her home and asked to be left out of the investigation. Father said that he worked two jobs from 7 a.m. to 11 p.m. and did not have time for family preservation services, so he refused to participate in these services.

On August 25, 2014, DCF filed the CINC petition in district court. DCF alleged that reasonable efforts had been made to prevent the removal and that emergency removal was necessary because the Children were likely to sustain harm if not immediately removed from the home. DCF decided all reasonable efforts were exhausted because Father and Girlfriend refused to participate in family preservation services. On that same day, the district court issued an ex parte order of protective custody, placing the Children in the temporary care, custody, and control of DCF.

On December 10, 2014, the district court adjudicated C.N. Jr. a CINC because the district court found Father had physically abused him. The district court also found C.N. and A.N. to be CINC because they lived in the same house as someone who had been physically abused. KVC Kansas (KVC), the State-contracted agency providing services, developed Father's reintegration plan on January 6, 2015 (2015 Reintegration Plan).

3

On February 10, 2015, the district court adopted the 2015 Reintegration Plan for Father, with the target completion date of August 1, 2015. Reintegration tasks required Father to (1) maintain appropriate housing approved by KVC; (2) maintain a legal source of income and provide verification to KVC; (3) participate in a parenting class approved by KVC; (4) attend all visitation as court ordered; (5) ensure that the Children are always supervised; (6) refrain from the use of physical discipline; and (7) participate in an anger management program. KVC reported that Father was making progress in his tasks by maintaining housing and employment and by participating in therapy. The court ordered the Children to remain in DCF custody while Father continued to work on the reintegration plan but authorized unsupervised visits for up to four hours.

On April 14, 2015, KVC reported to the district court that Father was still making progress in his reintegration tasks. He had housing, was employed, and participated in therapy. He scheduled parenting classes to begin at the end of April. KVC also reported that Father missed a couple of scheduled visits and on the visits that occurred, the foster parents expressed some concerns—such as Mother and Girlfriend being present and the Children having nightmares after watching a scary movie. KVC also mentioned that it was sometimes difficult to contact Father because his phone was often shut off. Still, KVC recommended that Father's visitation be extended to eight hours. The court ordered the Children to remain in DCF custody, ordered unsupervised visits with Father up to eight hours, and ordered Mother and Girlfriend to have no contact with children during Father's visitation.

On May 21, 2015, KVC reported that Father missed one visit since the last report. Foster parents continued to worry about Girlfriend being present at visits and A.N. reported she was unsupervised at the park. KVC recommended overnight visits, but the district court ordered Father's visits to revert to supervised visits.

By July 14, 2015, KVC reported that Father had stopped making progress on his tasks. Father could not provide verification that he was participating in therapy, anger management, or parenting education services. He had not visited his Children since May 23, 2015. The court ordered the Children to remain in DCF custody and ordered Father to participate in supervised visits, attend parenting education classes, and maintain consistent contact with KVC.

In November 2015, KVC reported that Father visited his Children three times since the last report but missed four scheduled visits. Father provided KVC with verification that he participated in anger management classes and parenting education. But Father continued seeing Girlfriend, who refused to participate in family services.

On January 13, 2016, KVC recommended that Father's parental rights be terminated due to lack of progress. KVC reported five cancelled visits. But the report did not make the reasons for cancellation clear—whether it was an issue with Father, KVC, or Court Appointed Special Advocates (CASA).

In March 2016, KVC reported that Father had missed 24 out of 52 visits since the last review. KVC or CASA was the cause for cancellation of four of these visits. Father explained that lack of transportation hindered his weekly visits with the Children.

On June 6, 2016, the State moved the district court to terminate Father's parental rights, and the district court scheduled a hearing for September. But Father's progress improved and at the September hearing, the district court gave KVC the discretion to lengthen Father's visits with the Children and scheduled another review in two months. In November, the district court ordered the continued out-of-home placement of the Children but granted KVC the discretion to expand visits to overnight. Father was also ordered to participate in family therapy services.

On January 10, 2017, the district court ordered that the Children remain in legal DCF custody but that KVC could place the Children back with Father. The State returned the Children to Father's home on January 19, 2017. An aftercare worker made weekly visits, during which the home was always clean and organized. The Children remained in Father's home without incident until March.

On March 8, 2017, C.N. Jr. got in a fight at school and was suspended. When the school told C.N. Jr. they would call his Father, C.N. Jr. said that he was afraid to go home because his Father would beat him. C.N. Jr. informed school staff and police that his Father beat him with a belt, shut his fingers in a drawer, and would shoot him. As a result of this report, the Children were immediately placed in respite care. While in respite care, the Children reported other incidents of physical abuse by Father, gun shots fired in the house, and Father locking them in a room without adequate supervision. All three Children returned to foster care on March 15, 2017.

Father's visits with Children resumed on May 22, 2017. He missed a scheduled visit on June 19. Father did not contact KVC until July 18, 2017. At the August hearing, KVC reported having trouble contacting Father. The record also reflects that Father had trouble contacting KVC. The case manager acknowledged Father had called and left a message, but the case manager's returned call went unanswered. Father participated in all scheduled visits in October following family therapy sessions.

On November 28, 2017, the court ordered the children to remain in DCF's custody but that C.N. and A.N. could be reintegrated with Father. C.N. Jr. remained in out-of-home placement. A month later, on December 22, C.N. and A.N. went home. For the next several months, the status quo was maintained with the girls at home with Father and C.N. Jr. in out-of-home placement. Father continued visits and family therapy with C.N. Jr. Father also started individual therapy.

The March 2018 KVC Court Report raised several concerns about Father's parenting of C.N. and A.N. He canceled several aftercare meetings and the ones Father attended, he minimally participated. He was unreceptive to suggestions to improve the girls' school attendance and grades; he pulled the girls from family therapy sessions; he stopped their medicines; and there was fear that the girls were left unattended while Father worked.

On July 10, 2018, C.N. and A.N. re-entered foster care because Father was incarcerated. The girls had been staying with Mother without KVC or DCF's knowledge or approval. At the July permanency hearing the district court ordered the girls to be returned to out-of-home placement.

On December 11, 2018, the court ordered supervised visits with Father once he was released from incarceration and had negative urinary analysis (UA). On January 31, 2019, KVC developed a new reintegration plan (2019 Permanency Plan). Father did not attend the meeting. KVC added new tasks because of Father's "legal trouble." The new plan was filed with the district court on April 22, 2019, and later mailed to Father. Yet no journal entry approving the new reintegration plan was ever submitted by the district court. The 2019 Permanency Plan listed 10 tasks for Father to complete—7 from the original reintegration plan plus 3 new tasks: participate and comply with KVC's UA policy; resolve all legal matters; and comply with all court orders.

At the July 9, 2019, permanency hearing the district court found that reintegration was no longer viable. It moved C.N. and A.N.'s case from reintegration to adoption and C.N. Jr. to another planned permanent living arrangement. Father was then living at the VA Homeless Shelter. He had no housing, employment, or reliable transportation.

As of August 21, 2019, KVC had scheduled no visits for Father because Father had not submitted drug tests. On August 26, 2019, the State moved the court once again to terminate Father's parental rights. On this same day, Father tested positive for cocaine.

The district court held a termination hearing on January 6, 2020. The district court took judicial notice of the court file and the previous stipulation that the court reports would be admitted into evidence as testimony for those witnesses. The State called Danielle Gunn, a reintegration manager with KVC, to testify. Gunn cited visitation inconsistency as the biggest failure to reintegration. She testified that Father was eligible for 183 total visits since the State removed the Children in 2014 of which he missed 109. Some visits were canceled due to lack of transportation, illness, or inclement weather. Gunn also testified that Father failed to complete two other critical tasks: provide adequate housing and proof of legal employment.

Father testified that he would visit the KVC office, leave messages, and make phone calls but no one was ever available or returned calls. He testified that he would get "the run around" because the Children were all in different places and KVC had trouble coordinating visits. He would eventually find out the caseworker had quit or moved, and the cycle would continue. Father testified to having 17 or 18 case managers over the years. Father also testified that he had applied for a HUD housing voucher and would qualify for a three-bedroom house if the Children were returned.

Father also called Berna Hollister to testify of his recent employment with her. Hollister also testified that she had given Father a car so he would have transportation to work. Finally, Hollister testified that she trusted Father around her kids and grandkids.

After hearing the evidence, the district court found, by clear and convincing evidence, that Father was unfit and that public and private agencies had made reasonable efforts to rehabilitate the family. The district court mentioned Father's inability to

maintain housing and employment. The district court said that Father's inconsistent contact, visitation, or communication with the Children, including missing more than half of the scheduled visits, showed a lack of interest in their wellbeing. The district court also found Father presumptively unfit because the Children had been in out-of-home placement for more than two years cumulatively and there was a substantial probability that Father would not carry out a reintegration plan. The district court also found that Father's unfitness was unlikely to change in the foreseeable future and that termination of his parental rights was in the best interest of the Children.

On February 12, 2020, the district court filed a journal entry terminating Father's parental rights. The district court later granted Father's motion to appeal out of time.

DID THE DISTRICT COURT IMPROPERLY APPLY THE PRESUMPTIONS OF UNFITNESS?

Father first claims he was deprived of his due process rights under the United States Constitution when the district court relied on the presumptions of unfitness in K.S.A. 2020 Supp. 38-2271 to terminate his parental rights. A parent's right to decide about the care, custody, and control of his or her children is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. This right is not absolute, however, because the welfare of children is a matter of State concern. Given these competing interests, a parent is entitled to due process of law before he or she can be deprived of this fundamental right. *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). In this context, the right to due process means notice and an opportunity to be heard. *In re C.H.W.*, 26 Kan. App. 2d 413, 419, 988 P.2d 276 (1999) (stating that notice and an opportunity to be heard and to defend are essential requirements of due process).

The district court found Father presumptively unfit because (1) the Children had been in an out-of-home placement for more than one year and Father had substantially neglected or willfully refused to comply with a reasonable reintegration plan, approved

9

by the court; and, (2) the Children had been in an out-of-home placement for more than two years and Father failed to carry out a reasonable reintegration plan, approved by the court; and there is substantial probability that Father will not carry out the plan in the near future. K.S.A. 2020 Supp. 38-2271(a)(5) and (6).

Father argues the district court erred by finding him presumptively unfit because the evidence the State presented in support of this presumption was from the 2019 Permanency Plan that the district court never approved. Father claims the State violated his due process rights when KVC usurped the district court's statutory authority and deviated from the standard protocol by not presenting the amended reintegration plan to him or the court.

The State responds that Father had constructive knowledge of the 2019 Permanency Plan because most of the tasks on the amended plan were the same as the tasks on the 2015 Reintegration Plan that the district court had approved. The State also asserts that Father had twice before completed the tasks on the original plan; the new plan was mailed to Father; the case manager reviewed the new plan with Father; and Father never objected to the new plan. And although there was no formal journal entry showing the district court officially adopted the 2019 Permanency Plan, the State argues there was circumstantial evidence showing the court's approval.

In district court, Father objected to evidence being presented under the 2019 Permanency Plan because it was never approved by the court. But Father never made the argument in district court that he is making now: that his due process rights were violated by the district court relying on the statutory presumptions of unfitness. Generally, issues not raised before the district court cannot be raised on appeal. *In re M.M.L.*, 258 Kan. 254, 261, 900 P.2d 813 (1995). The court will make an exception to this general rule when it is necessary to serve the ends of justice or to prevent a denial of fundamental rights. 258 Kan. at 261.

10

Father asks us to address the constitutional claim for the first time on appeal to serve the ends of justice and to prevent a denial of fundamental rights. This court has considered a similar argument for the first time on appeal under the same exception. See *In re W.H.*, No. 112,909, 2015 WL 4716335, at *4-5 (Kan. App. 2015) (unpublished opinion) (addressing the father's argument for the first time on appeal that his due process rights were violated because he was denied his statutory right to counsel). We will address Father's issue for the first time on appeal under this exception.

Due process is flexible and requires only such procedural protections as the situation demands. *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 82, 209 P.3d 200 (2009). And a due process violation exists only when a claimant can establish that he or she was denied a specific procedural protection to which he or she was entitled. *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274 (2002). Whether Father's due process rights were violated is a question of law subject to de novo review. *In re Adoption of B.J.M.*, 42 Kan. App. 2d at 81.

*Discussion*

To decide whether due process required the district court to formally approve amended reintegration tasks before terminating parental rights, this court applies the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). This test requires the court to weigh these factors: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens the additional or substitute procedures would entail. *Winston*, 274 Kan. at 409.

As for the first factor, the individual interest at stake is Father's right to the custody and control of his children. In this context "the private rights affected by governmental

11

action are very significant and are entitled to the highest protection from unwarranted governmental action." *In re J.L.*, 20 Kan. App. 2d 665, 671, 891 P.2d 1125 (1995).

No one disputes that Father, as a biological parent, has a fundamental right to raise his Children. This right is not absolute, however, because the welfare of children is a matter of State concern. *In re R.M.C.H.*, No. 104,249, 2011 WL 1344774, at *5 (Kan. App. 2011) (unpublished opinion). To establish a constitutional violation, Father must show the process followed created a risk he would be erroneously deprived of his interest, the second *Mathews* factor. See *In re J.D.C.*, 284 Kan. at 166-67 (holding that claimant must establish "the risk of erroneous deprivation of the [particular liberty] interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards").

The third *Matthews* factor requires the district court to consider the government's interest. The State has an interest in protecting children. "[T]he government's parens patriae interest in protecting minor children is substantial and of great importance." *In re J.L.*, 20 Kan. App. 2d at 675.

Father argues that the district court relied on a permanency plan that included amended reintegration tasks, and not a separate stand-alone "Reunification Plan," to find him unfit and terminate his rights. Father concedes there is no statutory requirement for a separate plan but argues it is best practice and customary to have a separate document. He argues that because the reintegration tasks were buried within the permanency plan, he did not know what KVC expected him to accomplish before the Children could be returned to his care.

Father's constitutional due process rights were not violated based on the record before this court. To be clear, the 2019 Permanency Plan with all its requirements was filed with the district court and discussed at the later review hearings, but it was never

12

formally approved by the district court. The amended plan was nearly identical to the 2015 Reintegration Plan that the district court approved, except it added three new tasks because of Father's legal troubles: (1) participation in and compliance with KVC's UA policy; (2) resolution of all legal matters; and (3) compliance with all court orders. The evidence shows Father was aware of these requirements and never objected to them.

More importantly, the district court's termination of parental rights order was based mainly on Father's failure to provide stable housing and employment and his failure to maintain visitation. These requirements were all part of the 2015 Reintegration Plan that the district court approved.

Finally, we observe that the district court only relied on the statutory presumptions of unfitness as an alternative basis for terminating Father's parental rights. In ruling from the bench at the termination hearing, the district court found by clear and convincing evidence that Father was an unfit parent based on several statutory factors under K.S.A. 2020 Supp. 38-2269(b) and (c). We will discuss the sufficiency of the evidence to support these findings in the next section of this opinion. Additionally, the district court found there were presumptions of unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) and (6). But the district court's findings on the statutory presumptions of unfitness does not detract from the district court's primary findings that the State proved by clear and convincing evidence that Father was an unfit parent under K.S.A. 2020 Supp. 38-2269(b) and (c). Thus, any error by the district court in relying on the statutory presumptions of unfitness was harmless and did not affect the outcome of the proceedings. See *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (applying constitutional harmless error standard).

### DID THE DISTRICT COURT ERR IN FINDING FATHER UNFIT AND TERMINATING HIS PARENTAL RIGHTS?

Father next challenges the district court's finding of unfitness and the termination of his parental rights. The State must prove by clear and convincing evidence that the parent is unfit "by reason of conduct or condition" making him or her "unable to care properly for a child." K.S.A. 2020 Supp. 38-2269(a). Once the district court has adjudicated a child as a CINC, the district court may terminate a parent's rights by a finding of unfitness. K.S.A. 2020 Supp. 38-2269(a).

When an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on the clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Father first challenges the district court's finding of unfitness. More specifically, he argues that KVC did not make reasonable efforts to rehabilitate the family; that Father did not lack effort to adjust his circumstances to better meet the needs of the Children; and that KVC and foster parents shared the blame for cancelled or unscheduled visits. Next, Father argues that the district court did not support its findings with sufficient evidence that his circumstances were unlikely to change in the foreseeable future. Finally, Father argues that the district court abused its discretion by declaring termination in the best interests of the Children.

The State responds that KVC made reasonable efforts because they offered family preservation services before the Children were removed, reintegration services while the Children were in out-of-home placement, and aftercare services once they were placed back home on the two previous occasions. The State suggests that KVC gave Father every chance to succeed but he chose not to avail himself of the offered services. The State argues that the record has sufficient evidence that Father's circumstances were unlikely to change given his history in the previous five years.

*Did the district court err in finding Father statutorily unfit?*

The statute lists nonexclusive factors the court will consider in determining unfitness. K.S.A. 2020 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2020 Supp. 38-2269(c). Any one of the factors in K.S.A. 2020 Supp. 38-2269(b) or (c) "may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2020 Supp. 38-2269(f).

The district court found Father statutorily unfit for three reasons:  (1) a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; (2) Father's lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of the Children; and (3) the Children had been in DCF's custody and placed with neither parent for 15 of the most recent 22 months and Father failed to carry out a reasonable reintegration plan approved by the court; or he failed to maintain regular visitation, contact, or communication with the Children. See K.S.A. 2020 Supp. 38-2269(b)(7), (8), (9), (c)(2) and (3).

As we have discussed, the district court also relied on these two statutory presumptions of unfitness when terminating Father's parental rights:  (1) the Children had been in an out-of-home placement for more than one year and Father had substantially

15

neglected or willfully refused to comply with a reasonable reintegration plan, approved by the court; and (2) the Children had been in an out-of-home placement for more than two years; that Father failed to carry out a reasonable reintegration plan, approved by the court; and that there was substantial probability that Father would not carry out the plan in the near future. K.S.A. 2020 Supp. 38-2271(a)(5) and (6).

First, Father argues that KVC did not extend reasonable efforts to rehabilitate the family. K.S.A. 2020 Supp. 38-2269(b)(7). Father argues that because of KVC's high staff turnover and reluctance by KVC to schedule more family counseling that KVC did not make reasonable efforts.

The purpose of the reasonable efforts' requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort. *In re L.C.P.*, No. 118,841, 2018 WL 4039170, at *9 (Kan. App. 2018) (unpublished opinion). Throughout this case, Father often failed to communicate with DCF or KVC staff and failed to participate in their efforts to rehabilitate the family.

KVC offered family preservation services before the State removed the Children in 2014. Father refused those services. KVC helped facilitate anger management classes, family therapy, parenting classes, and individual therapy. KVC conducted home visits and aftercare services once the Children were returned home. When the Children were in out-of-home placement, KVC coordinated visitation. Throughout the case, KVC held case management meetings, attended permanency hearings, and reported Father's progress. According to the record, Father refused services; he went months without contacting KVC; and he missed more than half the offered visitations.

Father is justified in his frustration dealing with more than 17 caseworkers throughout the case. No doubt the frequent staff turnover created communication gaps. With that said, Father's argument still fails. There is ample evidence in the record

16

supporting the efforts KVC made during the five and one-half years the Children have been in care. And viewing this evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that KVC made reasonable efforts. Thus, clear and convincing evidence supports the district court's finding that reasonable efforts were made by the agencies to rehabilitate the family, but those efforts were ultimately unsuccessful. See K.S.A. 2020 Supp. 38-2269(b)(7).

Father next challenges the district court's finding that he was unfit under K.S.A. 2020 Supp. 38-2269(b)(8), which permits the court to find unfitness if there has been a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child." Father argues that because he succeeded in completing the reintegration tasks before, he has proved his commitment to improving his situation. He also argues that his potential HUD housing, steady employment, and negative drug tests all support his efforts to change.

The district court noted that Father made some efforts. Father attended some visits, some therapy, and some classes. He has had housing and employment at times in the last six years. Yet those efforts have not been lasting. Father's compliance with the court's basic requirements of providing housing, sustaining employment, and attending visitations have waned over the years. Two previous integrations failed. Father was incarcerated, which led to his loss of housing and employment. And, at the time of termination, Father was homeless. All of this constitutes clear and convincing evidence supporting the district court's finding that Father's lack of effort to change his circumstances, conduct, or conditions to meet the needs of the Children makes him unfit. See K.S.A. 2020 Supp. 38-2269(b)(8).

Father next argues that the court erred by finding him unfit under K.S.A. 2020 Supp. 38-2269(b)(9) because besides the Children being in custody and in out-of-home placement for 15 of the most recent 22 months, Father failed to carry out a reasonable

17

reintegration plan approved by the court and he failed to maintain regular visitation, contact, or communication with the Children. See K.S.A. 2020 Supp. 38-2269(b)(9), (c)(2) and (3). Father does not contest the first requirement as the Children were in out-of-home placement for at least 15 of the most recent 22 months. But he argues that KVC's turnover and failure to communicate were the reasons for the canceled or unattended visits. He also argues that it was improper for the district court to rely on this statutory basis because, due to KVC's failure to submit the latest reintegration plan for court approval, he did not have proper notice.

We have already discussed that Father had sufficient notice of his reintegration tasks, but he failed to achieve his reasonable goals. Father also was eligible for 183 visits during the time the Children were in DCF custody. Father attended only 74 of these visits. Most recently, when the girls were returned to foster care in July 2019, Father was eligible for 71 possible visits. He attended only four; of which, he was late to two. Thus, clear and convincing evidence supports the district court's finding that Father's failure to carry out a reasonable reintegration plan and maintain regular visitation make him unfit. See K.S.A. 2020 Supp. 38-2269(b)(9), (c)(2) and (3).

Finally, we need not address the district court's findings under K.S.A. 2020 Supp. 38-2271, presumption of unfitness, because Father does not raise a sufficiency of evidence issue; he only raised a due process issue which we addressed in Issue I.

*Did the district court err in finding Father's unfitness was unlikely to change in the foreseeable future?*

Clear and convincing evidence must also support the district court's finding that the conduct or condition rendering Father unfit is unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). The foreseeable future is examined from the perspective of a child. *In re K.L.B.*, 56 Kan. App. 2d 429, 446-47, 431 P.3d 883 (2018).

Father argues that even with a finding of unfitness, the court must find that circumstances are such that the conduct or condition is "unlikely to change in the foreseeable future." Father claims that the district court erred in its finding because Father had applied for a HUD housing voucher and qualified for a three-bedroom house if he were to get his Children back. Hollister testified to Father's ongoing employment with her and that she gifted Father a car so that he would have transportation to work. Father argues that K.S.A. 2020 Supp. 38-2269(a) does not require the district court to terminate parental rights upon a finding of unfitness.

A district court can look to the parent's past conduct as an indicator of the parent's future behavior. *In re K.L.B.*, 56 Kan. App. 2d at 447. Father had more than five years to change his circumstances and reunite with the Children. As discussed, Father made some efforts over the years, but it was not enough to overcome the necessarily high hurdle to have the Children returned home. The district court looked at Father's history with employment and his current homelessness to find that Father's unfitness was unlikely to change in the foreseeable future. Thus, we conclude the district court had clear and convincing evidence to support this finding.

*Did the district court err in finding it was in the Children's best interests to terminate Father's parental rights?*

Finally, Father briefly argues that terminating his rights was not in the best interests of the Children because the Children were older, knew Father, and Father had stayed involved. Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

19

This court reviews the best-interests determination under the abuse of discretion standard. Because Father does not point to an error of law or fact, the question becomes whether no reasonable person would come to the same conclusion as the district court. See *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

Here, the State removed the Children because of physical abuse, the district court found Father lacked interest in the Children because he missed most visitations, he was homeless, and the record reflects Father had strained relationships with two of the three Children. Father had twice integrated with the Children and the State removed the Children both times after Father's conduct required removal again—once for fear of additional physical abuse, and once because Father was incarcerated. Father's actions have caused him to be unable to parent the Children. Because reasonable people could agree with the district court's finding that termination was in the Children's best interests, that decision was not an abuse of discretion.

Affirmed.