NOT DESIGNATED FOR PUBLICATION

No. 126,397

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEPHEN MATTICE,
*Appellant*,

v.

CITY OF STAFFORD,
*Appellee*.

MEMORANDUM OPINION

Appeal from Stafford District Court; STEVEN E. JOHNSON, judge. Oral argument held April 9, 2024. Opinion filed August 2, 2024. Reversed and remanded with directions.

*Kurt A. Harper* and *Dylan P. Wheeler*, of Depew Gillen Rathbun & McInteer, LC, of Wichita, for appellee.

*Allen G. Glendenning*, of Watkins Calcara, Chtd., of Great Bend, for appellee.

Before CLINE, P.J., ATCHESON and PICKERING, JJ.

PER CURIAM: Stephen Mattice contends the mayor and members of the Stafford City Council orchestrated his termination as police chief because he informed them the city administrator had retaliated against him for telling an outside law enforcement agency that a former officer had an improper sexual relationship with a minor. So Mattice has sued the City for wrongful termination. The City counters that Mattice was ill-suited for his job—something it says had become apparent to everyone within a few months— and he was fired for incompetence rather than legally protected whistleblowing. So the

1

City characterizes Mattice's complaint about the city administrator as a ploy to neutralize or at least deflect from his poor work performance.

The Stafford County District Court granted the City's motion for summary judgment. In doing so, the district court failed to correctly apply the stringent standards weighing against summary judgment. The City presented plausible evidence and concomitant legal arguments supporting its theory of the case. But Mattice responded with plausible evidence and arguments for his whistleblower claim circumstantially suggesting an impermissible retaliatory intent animated his termination. Conflicts over material factual representations must be left for jurors (or a district court sitting as the fact-finder) to resolve during a trial after they have seen and heard the witnesses and examined any documentary evidence. A district court cannot make those credibility determinations from a disembodied summary judgment record consisting mostly of affidavits and deposition excerpts. We, therefore, reverse the district court's entry of judgment for the City and remand for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

Because the standards governing review of motions for summary judgment in the district court and on appeal directly shape how the record evidence must be examined, we begin there. See *Bouton v. Byers*, 50 Kan. App. 2d 34, 36, 321 P.3d 780 (2014). The central principles are well-known and regularly recited. The district court must view the properly presented evidence in the most favorable light for the party opposing the motion, here Mattice, and give that party the benefit of every reasonable inference that might be drawn from the evidence. Taking the evidence in that manner, the moving party, here the City, needs to demonstrate the absence of any genuine dispute over the material facts and, in turn, an entitlement to judgment as a matter of law. *Trear v. Chamberlain*, 308 Kan. 932, 935-36, 425 P.3d 297 (2018); *Miller v. Hutchinson Regional Med. Center*, 63 Kan. App. 2d 57, 59, 525 P.3d 10, *rev. denied* 317 Kan. 845 (2023). As we recently explained,

the party requesting summary judgment "[b]asically . . . submits no reasonable construction of the evidence would permit a jury to return a verdict for the opposing party." 63 Kan. App. 2d at 59. Issues turning on intent or motive are particularly ill-suited for determination on summary judgment because proof of an intangible mental state typically rests on inferences drawn from circumstantial evidence. See *Hill v. State*, 310 Kan. 490, 520, 448 P.3d 457 (2019); *Rosen v. Hartstein*, No. 108,479, 2014 WL 278717, at *4 (Kan. App. 2014) (unpublished opinion) ("Courts generally should be cautious about granting summary judgment when the controlling issue turns on intent[.]").

An appellate court applies the same standards in reviewing a challenge to a district court order granting summary judgment. We, therefore, examine the record in the best light for Mattice and disregard evidence that detracts from or undermines his factually supported assertions. Because neither we nor the district court should weigh conflicting evidence generally or resolve credibility disputes, the decision to grant summary judgment functionally presents a question of law we assess without deference to the district court. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009); *Miller*, 63 Kan. App. 2d at 59.

Against that legal backdrop, we look at the evidentiary record in a way that largely discounts the City's representations that dispute or conflict with Mattice's version of the relevant circumstances. It is, then, a decidedly one-sided view of the circumstances. And, accordingly, we do not mean to suggest how those disputes and conflicts could or should be resolved in a trial.

At the outset, we mention that the district court previously granted the City's motion to dismiss under K.S.A. 60-212(b)(6) on the grounds that Mattice's petition failed to state a legally cognizable claim for whistleblowing. A panel of this court reversed that ruling and remanded the case to the district court. *Mattice v. City of Stafford*, No. 122,907, 2021 WL 4227730, at *1 (Kan. App. 2021) (unpublished opinion). The parties

3

then undertook discovery, and the City filed its motion for summary judgment. Our earlier ruling has no direct bearing on this appeal both because that decision was based on the allegations in the petition and not on the evidence developed during discovery and because a more stringent legal standard governs motions to dismiss. *Williams v. C-U-Out Bail Bonds, LLC*, 310 Kan. 775, 784, 450 P.3d 330 (2019) (motion to dismiss under K.S.A. 60-212[b][6] proper only if allegations in petition fail to support claim on any theory).

The facts developed in discovery show Mattice started as police chief in July 2018 after formally accepting the job earlier that year. The record is skimpy on his professional background. Mattice worked in law enforcement elsewhere for many years but had never headed a department. The City also hired two officers without experience shortly before Mattice came on board; they completed their mandatory state training in August. Stafford is a small community, so Mattice and the two rookies formed its full complement of commissioned police officers. In the municipal hierarchy, Mattice reported to City Administrator Jami Downing.

Shortly after he started as police chief, Mattice had a conversation with a former Stafford police officer who said he had reported to then-Chief Doug Brown that another officer had an ongoing sexual relationship with an underage girl. Brown purportedly told the reporting officer that he had disciplined the offending officer. By the time Mattice became chief, Brown had died, and neither of those officers still worked for the City. But the offending officer apparently worked in the Stafford County Sheriff's Department. Mattice could not find a disciplinary record or any documentation of an investigation in the police department's files.

According to Mattice, at that point, he understood the sexual contact occurred several years earlier when the girl was less than 16 years old, making the relationship a crime. See K.S.A. 21-5506(a) (indecent liberties); K.S.A. 21-5506(b) (aggravated

4

indecent liberties). Mattice concluded he should report the circumstances to an outside law enforcement agency for investigation and thought the Kansas Bureau of Investigation would be the logical place. Mattice asserts that in early October 2018, he gave Downing, in his words, "a heads up" that he would be contacting the KBI. Mattice recalls Downing telling him the matter had already been looked into and not to stir things up for the former officer. Mattice believed Downing was friends with the officer.

Mattice then communicated with an agent in the KBI's Great Bend office. After investigating the information, the KBI concluded the young woman was 16 years old during her relationship with the former Stafford police officer, so nothing criminal occurred.

Mattice contends that in the meantime, Downing began treating him coldly, started micromanaging him and the police department, and unfairly criticized his work. They apparently clashed over several specific matters. According to Mattice, his working relationship with Downing continued to deteriorate, and especially given the size of the municipal government, he found the situation both stressful and damaging to the department's operation. On December 5, Mattice met with Mayor Julie Lyon at her residence and outlined the workplace problems as he saw them. He suggested that Downing be removed as his direct supervisor. At Mattice's request, he met with Mayor Lyon and the city council on December 7, a Friday. During the meeting, held largely in executive session, Mattice presented and then read a detailed letter describing the poor work environment and his assessment of the causes. He later said he perceived the councilmembers as being receptive to his concerns and his suggested solution.

The city council met the following Monday, again in executive session, and directed Downing to ask for Mattice's resignation and to terminate his employment if he refused. Downing and Lyon met with Mattice the next day. Downing fired him.

5

The City's counternarrative suggests Mattice had work-related problems almost from the start of his employment. He purportedly failed to properly schedule code enforcement and had difficulty setting the officers' work hours, leaving the city without a visible police presence at times. In affidavits prepared during discovery, Lyon and City Attorney Don Knappenberger stated that Mattice's job performance became a topic for discussion with the city council the third week in October. Lyon said she met regularly with Downing well into November to assess Mattice's work. In early December, Knappenberger presented the councilmembers with typewritten reports ostensibly from the City's two new police officers. Each report is dated December 2, 2018, and is unsigned. The reports recount what the officers characterized as poor tactical decisions Mattice made in the field and his failure to provide them with meaningful on-the-job training. According to Knappenberger, Mattice was informed of the reports and suggested the two officers should be terminated.

Mattice asserts he was not informed of any ongoing concerns about his job performance. He said relatively early on he had been questioned about how he handled code enforcement and took steps to improve that aspect of the department. In his deposition, Mattice denied having problems with the other two officers. And in the letter he presented to the city council outlining his concerns about the workplace he did not suggest they be fired.

In moving for summary judgment, the City argued that Mattice could not present evidence establishing a cognizable whistleblower claim for wrongful termination and that he was fired for poor job performance. Mattice countered that especially given the summary judgment standards, he had met his burden to go forward: (1) His statement to Mayor Lyon and the councilmembers about how Downing treated him after he contacted the KBI constituted protected whistleblowing; and (2) the intent animating the decision to get rid of him presented a question of fact that could not be resolved on summary

6

judgment. In a short memorandum decision, the district court sided with the City and granted summary judgment. Mattice has appealed.

ANALYSIS

On appeal, Mattice and the City essentially stake out the same legal ground they respectively claimed in the district court. We have already described our standard of review. So we turn to the legal sufficiency of the whistleblower claim Mattice has asserted and the concomitant issue of the intent behind the decision to fire him.

*General Principles Governing Whistleblower Claims*

The parties agree Mattice was an at-will employee of the City. As a general proposition, an employer may terminate an at-will employee for a good reason, a silly reason, or wholly arbitrarily—as by the flip of a coin. But an employer cannot act in a way that violates an express common-law or statutory protection afforded workers. For example, an employer cannot fire someone based on a protected class characteristic such as race, religion, or sex even if they are an at-will employee. See *Hill*, 310 Kan. at 500. Likewise, an employer cannot retaliate against an employee who has engaged in conduct protected as a matter of public policy. *Campbell v. Husky Hogs*, 292 Kan. 225, 227-28, 255 P.3d 1 (2011). Again, for example, the Kansas Supreme Court has recognized that an employer cannot fire an employee for filing a workers compensation claim. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1275, 38 P.3d 679 (2002). Pertinent here, the court has also held that employees engaging in judicially defined forms of whistleblowing cannot be fired for that reason. *Campbell*, 292 Kan. at 228; *Palmer v. Brown*, 242 Kan. 893, Syl. ¶ 3, 752 P.2d 685 (1988).

The *Palmer* decision continues to furnish the governing elements of a common-law wrongful termination claim for whistleblowing: (1) A reasonably prudent person in

7

the position of the employee would have concluded that a coworker or employer was engaged in activity that violated rules, regulations, or the law pertaining to public health, safety, and the general welfare; (2) the employer had knowledge of the employee's reporting of such a violation before discharging the employee; (3) the employer discharged the employee in retaliation for making the report; and (4) the plaintiff reported the violation in good faith based on a concern regarding the wrongful activity rather than for a corrupt motive. 242 Kan. 893, Syl. ¶ 3; see *Conge v. City of Olathe*, 64 Kan. App. 2d 383, 396-97, 551 P.3d 225 (2024) (citing *Palmer* for elements of whistleblower claim). Protected whistleblowing need not be to an outside entity; an employee's report of covered wrongdoing to the employer's "management" is sufficient. *Palmer*, 242 Kan. 893, Syl. ¶ 2. Our task is to determine if the summary judgment record contains facts, though disputed, supporting those elements under Mattice's whistleblowing theory.

To reiterate, Mattice says his letter and oral representations to Mayor Lyon and the city council on December 7 constituted a protected act of whistleblowing that, in turn, prompted his termination as police chief. The theory has three underlying and interlocking components. First, Mattice points to his decision to advise Downing that he intended to make a report to the KBI about the former police officer's sexual involvement with a minor. Second, he contends his report to the KBI was statutorily protected conduct under the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq. Mattice relies on K.S.A. 38-2224 that prohibits an employer from taking adverse action against an employee who has reported sexual abuse or other abuse or neglect of a child to a law enforcement agency. The statute specifically provides:

> "No employer shall terminate the employment of, prevent or impair the practice or occupation of, or impose any other sanction on, any employee because the employee made an oral or written report to, or cooperated with an investigation by, a law enforcement agency or the secretary relating to harm inflicted upon a child which was suspected by the employee of having resulted from the physical, mental or emotional abuse or neglect or sexual abuse of the child." K.S.A. 38-2224(a).

8

In turn, the revised code defines "'sexual abuse'" as "any contact or interaction with a child in which the child is being used for the sexual stimulation of the perpetrator." K.S.A. 2023 Supp. 38-2202(mm). And the revised code applies to any child in need of care, i.e., someone less than 18 years of age who has been neglected or abused in statutorily defined ways. K.S.A. 2023 Supp. 38-2202(d). An employer violating K.S.A. 38-2224(a) may be guilty of a class B misdemeanor. K.S.A. 38-2224(b). Third, Mattice contends Downing impermissibly interfered with his work by over-supervising him, lodging unwarranted criticisms, and otherwise micromanaging the police department because he went to the KBI, thereby violating K.S.A. 38-2224(a).

Applying the forgiving standard extended to the party opposing summary judgment, we are persuaded Mattice has assembled enough evidence to go forward with his whistleblower claim. He should be permitted to present that evidence in a trial to a jury or the district court. What the fact-finder may make of the conflicting accounts about what went on in the municipal government and with the police department in particular in the second half of 2018 is another matter. It is not for us to prophesize the proper outcome of that trial.

*Violation of Law Affecting Public Safety, Health, or Welfare*

In considering the first element of an actionable claim for whistleblowing under *Palmer*, we examine Mattice's theory. Essentially, he contends Downing's intrusion into the operation of the police department after he made his report to the KBI constituted activity that violated K.S.A. 38-2224, as a statute pertaining to public health, safety, or general welfare. We break down the parts of that element.

The purpose of K.S.A. 38-2224 is to protect employees from on-the-job retaliation if they report likely abuse of a minor to a law enforcement agency. The statute promotes a strong public policy in securing the general welfare of children in this state. The policy

is explicitly set out in the revised code. K.S.A. 38-2201(b)(2) (revised code "liberally construed to carry out the policies of the state," including "provid[ing] that each child . . . shall receive the care, custody, guidance[,] control and discipline that will best serve the child's welfare and the interests of the state"); K.S.A. 38-2201(b)(7) (state policy to "provide for the protection of children who have been subject to physical, mental or emotional abuse or neglect or sexual abuse"). More broadly, the State has a *parens patriae* interest in protecting children from harm and doing so not only aids them but promotes a public good. See *Santosky v. Kramer*, 455 U.S. 745, 766-67, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (recognizing state's *parens patriae* interest in welfare of children); *In re M.M.L.*, 258 Kan. 254, 267-68, 900 P.2d 813 (1995) (same). The antiretaliation protections in K.S.A. 38-2224(a) advance the public policy reflected in the revised code and the State's *parens patriae* role in securing the well-being of children generally. The importance of those protections as a matter of public policy is underscored by the criminal penalty attached to a violation of K.S.A. 38-2224(a).

Mattice's description of Downing's conduct, though vigorously disputed, outlines a course of action that impaired his ability to carry out his job and, thus, fits within the scope of the retaliation prohibited in K.S.A. 38-2224(a).

The content of Mattice's report to the KBI described inappropriate sexual conduct between the former police officer and a minor. Although Mattice was mistaken about the child's age—he believed she was less than 16 years old—that doesn't remove his reporting from the protection of K.S.A. 38-2224. First, the statute covers a report of harm the reporting employee "suspect[s]" resulted from abuse, including sexual abuse, of the child. See K.S.A. 38-2224(a). From the factual record, we may (and really must) infer Mattice legitimately believed the minor to have been less than 16 years old. Second, although the minor was actually 16 years old at the time she had the relationship with the police officer, that simply meant the officer had not committed a crime. Depending on the circumstances, the relationship might have been emotionally abusive or otherwise

10

debilitating or exploitive of the minor, rendering her a child in need of care, permitting State intervention under the revised code. Again, all of that brings Mattice's report to the KBI within the scope of K.S.A. 38-2224 and its antiretaliation protections.

We offer two additional observations about the first element of a whistleblower claim. First, Mattice alleges that Downing is the coworker who violated a law pertaining to the public welfare—K.S.A. 38-2224(a)—when she intruded on the operations of the police department. And Mattice blew the whistle on her when he informed the mayor and city council in early December 2018. The whistleblowing, as Mattice has framed the claim, was not his report to the KBI about the former Stafford police officer. Second, the record does not indicate that Mattice knew about K.S.A. 38-2224, its antiretaliation protections, and the public policy behind those protections when he went to the mayor and city council. But the test in *Palmer* requires only that "a reasonably prudent person" would know of the public policy. 242 Kan. at 900. The standard is purely objective and has no subjective component requiring that the whistleblower actually know of the public policy. So whistleblowing protects someone doing the right thing without necessarily knowing it's the right thing specifically as a matter of a declared public policy.

*Employer Knowledge and Retaliatory Adverse Action*

The second element of the *Palmer* test seems beyond dispute for summary judgment since Mattice's ostensible whistleblowing was to the city council—the decision-making body of the City—and the city council later directed that he be fired.

The third element requires the employer to have taken an adverse action against the employee "in retaliation for" the whistleblowing report. Firing an employee obviously constitutes an adverse action. See *Palmer*, 242 Kan. at 900 (termination); see also *Hill*, 310 Kan. at 502-03 (adverse change in working conditions short of termination actionable in claim for retaliation violating public policy, including protected

11

whistleblowing). Here, the City disputes Mattice's firing was retaliatory, as he claims, and contends the reason was his poor job performance. The conflict turns on a question of intent and motive. As we have said, summary judgment tends to be a notoriously poor vehicle for resolving disputes over state of mind. Seldom do employers announce or document an unlawful intent to retaliate against an employee, so the issue typically turns on competing strands of circumstantial evidence. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (in age discrimination case, Court notes there "'will seldom be "eyewitness" testimony as to the employer's mental processes'") (quoting *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 [1983]). Determining where those strands lead can be an elusive task.

To aid in that task, the Kansas Supreme Court has adopted a burden-shifting analytical tool the United States Supreme Court developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to get at an employer's intent when considering summary judgment in wrongful termination and other employment discrimination cases. See *Hill*, 310 Kan. at 513, 518; *Rebarchek v. Farmers Co-op & Mercantile Ass'n*, 272 Kan. 546, 552-53, 35 P.3d 892 (2001). The framework permits inferences of discrimination or other unlawful intent—here, retaliation for whistleblowing—to be drawn from case specific circumstances. See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Tanner v. Stryker Corporation of Michigan*, 104 F.4th 1278, 1288-89 (11th Cir. 2024) (applying *McDonnell Douglas* framework to assess employer's alleged retaliatory intent in Family Medical Leave Act claim); *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) ("When only circumstantial evidence of discriminatory intent is available, courts use the *McDonnell Douglas* burden-shifting framework to assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment.").

The *McDonnell Douglas* staging of proof first requires the employee to come forward with prima facie evidence of prohibited intent or animus, thereby triggering the employer's obligation to present a legitimate reason for the adverse action. See 411 U.S. at 802. The employee must then point to facts suggesting the employer's stated reason to be false or, in other words, a pretext for the impermissible intent. See *Hill*, 310 Kan. at 513; *Rebarchek*, 272 Kan. at 552-53. The first and second steps impose a comparatively relaxed burden of production on the plaintiff and the defendant, respectively. But the ultimate burden of persuasion to furnish evidence that would permit a jury to find unlawful intent always rests on the plaintiff, as the party resisting summary judgment. See *Hill*, 310 Kan. at 518; *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 272-74, 864 P.2d 1148 (1993); *Baker v. Upson Regional Medical Center*, 94 F.4th 1312, 1319 (11th Cir. 2024); *Garmon v. National Railroad Passenger Corp.*, 844 F.3d 307, 313 (1st Cir. 2016).

If the adverse employment action (here the termination) follows the protected conduct (here the whistleblowing) closely in time, that proximity permits a reasoned inference of a causal connection. *Hill*, 310 Kan. at 517 ("timing alone can be sufficient to make out a prima facie causation case"); see *Ball v. Credit Bureau Services*, No. 111,144, 2015 WL 4366440, at *10 (Kan. App. 2015) (unpublished opinion) ("Courts recognize that close temporal proximity in combination with other circumstantial evidence suggests an employer's stated reasons for an adverse action to be a cover-up for unlawful intent or purpose."). Based on the summary judgment record, Mattice's whistleblowing occurred on December 7, 2018, a Friday, when he informed the city council of Downing's conduct. On December 10—the next business day—the city council met and directed that Downing immediately secure Mattice's resignation as police chief or fire him. Downing carried out the directive less than 24 hours later. We find that sequence of events to be sufficient to support an inference of causation.

13

Mattice's prima facie case finds further support in his assertion—that we must credit in reviewing the summary judgment—he was never informed of the purported litany of problems with his job performance. He acknowledged some negative feedback about code enforcement and represents he endeavored to address those concerns. The City has produced no contemporaneous municipal records or documents outlining shortcomings in Mattice's work or that he was informed of them. There are no performance reviews; memos to Mattice; or other internal communications between or among Downing, Lyon, or any of the council members. The City has argued that there was no documentation because municipal policy requires that only disciplinary actions be memorialized and Mattice was never disciplined before he was fired. That's one explanation. Another reasonable inference, especially given Mattice's representation he was never told about the range of problems, would be that the City's elected officials and the city administrator ginned up the alleged deficiencies in December 2018 as a pretext for firing him. Mattice has met his initial burden under the *McDonnell Douglas* protocol.

By the same token, however, the City has presented what would be a legitimate reason for firing Mattice, especially as an at-will employee, if its evidence were credited. And that is sufficient to satisfy the City's slight burden of production in the second step of the protocol.

Accordingly, we consider the final step and ask whether Mattice has produced sufficient evidence to call into question the City's stated reason as a pretext or coverup for impermissible retaliation against him as a protected whistleblower. The evidence supporting Mattice's initial showing of the City's intent or motive may, of course, be considered at this juncture. The close timing between Mattice's whistleblowing and the decision to fire him coupled with the lack of contemporaneous documentation of the workplace problems would be enough for a reasonable person to find pretext. We are not saying that's the only conclusion our hypothetical reasonable person could come to, but it would be a permissible conclusion.

In *Ball*, for example, this court found the plaintiff satisfied his burden of persuasion under the *McDonnell Douglas* framework by both showing his employer fired him shortly after learning he had filed a statutory wage claim and pointing to the lack of any documentation of his purportedly poor work performance—the reason the employer asserted for his termination. That was enough to avert summary judgment on the issue of the employer's intent. 2015 WL 4366440, at *10-12. The court cited several federal cases finding the absence of contemporaneous documentation to be sound circumstantial evidence of pretext: *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("Carlton never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought."); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009) ("lack of prior notice of underperformance" evidence supporting pretext); *Bolin v. Okl. Conf. of the United Methodist Church*, 397 F. Supp. 2d 1293, 1308 (N.D. Okla. 2005) ("[A]bsence of negative work reviews," temporal proximity between protected conduct and termination, and dispute about source of policy employee supposedly violated ostensibly justifying termination are sufficient to deny employer's motion for summary judgment.); *Hernandez v. Data Systems Intern., Inc.*, 266 F. Supp. 2d 1285, 1305 (D. Kan. 2003) (employer's failure to tell employee he was performing inadequately or needed to improve particular skills "highlighted" pretextual quality of stated reasons for discharge). *Ball*, 2015 WL 4366440, at *12.

The City points to the unsigned statements from the other two police officers criticizing Mattice's work the council members received in December 2018. The City contends they support the decision to fire Mattice for legitimate reasons. For summary judgment purposes, the City concedes the allegations in the statements cannot be considered for the truth of the matters asserted because the officers have never verified the statements under oath through affidavits or deposition testimony. Regardless, however, the City says the statements informed the city council's decision. The argument

15

proves too little for summary judgment purposes. As the City would have it, the council members accepted the representations without inquiring of the officers and without soliciting a response from Mattice about the specific allegations. But the lack of any meaningful follow-up might reasonably be construed as the council members' use of the statements as nothing more than a device to mask their unlawful retaliatory animus. In reviewing summary judgment, we are obligated to credit the inference that cuts against the City.

The circumstances here are analogous to those in *Ball*, although the employer there ostensibly retaliated because the plaintiff filed a wage claim rather than having engaged in protected whistleblowing. The manner of proving unlawful intent in resisting summary judgment is the same. In short, Mattice produced enough evidence to generate a legitimate factual dispute as to whether the City retaliated against him for whistleblowing and, thus, to go forward on the third element outlined in *Palmer*.

*Employee's Good Faith*

Under the fourth and final element of a whistleblower claim, Mattice had to have acted in "good faith" rather than for a "corrupt motive such as . . . personal gain" in going to the city council about Downing's conduct. See *Palmer*, 242 Kan. at 900. This, too, entails an issue of intent typically unsuited for resolution on summary judgment. See *Sowder v. Lawrence*, 129 Kan. 135, 138, 281 P. 921 (1929); *Hill v. Perrone*, 30 Kan. App. 2d 432, 438, 42 P.3d 210 (2002); *Tri-Company Constr., Inc. v. Farmers and Merchants State Bank*, No. 64,872, 1991 WL 12018506, at *4-5 (Kan. App. 1991) (unpublished opinion); see also *McCottrell v. White*, 933 F.3d 651, 671 (7th Cir. 2019) (summary judgment notoriously inappropriate for intent and good-faith determinations). Although the City has argued Mattice's complaints about Downing amount to his contrivance designed to divert from the questions about the quality of his work, the summary judgment record is conspicuously thin on any direct or circumstantial evidence

16

bearing on his good faith or conversely on an impure motive aimed at confounding a legitimate move to fire him. The record does not warrant granting summary judgment for the City on this part of the whistleblower claim. On a full evidentiary exposition of this point at trial, a fact-finder would be in a position to assess Mattice's motives. We are not.

*Conclusion*

Having reviewed the summary judgment record in the correct light—favoring Mattice at every turn and in every factual dispute—we find the district court erred in ruling for the City. Mattice has presented facts that viewed in his favor establish a claim of wrongful termination for protected whistleblowing. And the related disputes over the City's motive and his good faith must be left for resolution in a trial. We, therefore, reverse the judgment and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings.